# THE UNITED STATES ELECTRIC LIGHTING COMPANY *v.* SULLIVAN.*

PARENT AND CHILD; DEATH BY WRONGFUL ACT; ACTION FOR NEGLIGENCE; CONTRIBUTORY NEGLIGENCE, INSTRUCTION TO JURY; MEASURE OF DAMAGES; EVIDENCE.

1. At common law the right of a parent to recover for the loss of the services of a minor child, like that of a husband for the loss of the services of the wife, is limited to the time that may have elapsed, if any, between the time of the injury giving rise to the action and the resulting death; and the right to the services terminated with death, and the estimate of damages ceased therewith.

2. A father who has been deprived of the services of a minor son by the negligent killing of the latter has no right of action against the wrongdoer independently of the act of Congress of February 17, 1885 (Code, § 1301), in view of the express provision of that act that the action for the negligent killing of one who might have maintained an action had he survived shall be brought by and in the name of the personal representative of the deceased.

3. It is not necessary to the maintenance of an action under the act of Congress of February 17, 1885, providing that where one has been killed by the negligent act of another the action shall be maintainable by the personal representative of the deceased for the benefit of the next of kin, that the next of kin, the parent or brother or sister, as the case may be, shall have a legal claim upon the services of which they

---

*Action for Wrongful Death.*— See also the following editorial notes containing a full presentation of the authorities: Common-law right of action of parent for loss of services of child killed, note to *Gulf, C. & S. F. R. Co.* v. *Beall,* 41 L. R. A. 807; as to how many distinct causes of action arise from injuries resulting in death, note to *Louisville & N. R. Co.* v. *McElwain,* 34 L. R. A. 788.

*Wrongful Death — Measure of Damages.*— See also the presentation of the authorities on this subject in editorial note to *Morgan* v. *Southern P. Co.* 17 L. R. A. 71.

*Negligence — Electric Wires.*— As to negligence in placing or looking after electric wires on or in buildings, see the full presentation of the authorities on that subject in editorial note to *Griffin* v. *United Electric Light Co.* 32 L. R. A. 400. As to liability for injuries by electric wires in highways, see editorial note to *Denver Consol. Electric Co.* v. *Simpson,* 31 L. R. A. 566, also containing a full presentation of the authorities.

*Contributory Negligence — Electric Wires.*— See also editorial note to *Griffin* v. *United Electric Co.* 32 L. R. A. 400.

have been deprived by the wrongful act of the defendant, although it might be possible under the terms of the act, which requires recovery *in solido*, that a judgment founded chiefly on proof of such damages to one of the next of kin would have to be shared finally with others less meritorious, that fact being one that in no wise concerns the wrong-doer (following *District of Columbia* v. *Wilcox*, 4 App. D. C. 90).

4. Where an electric lighting company removes its fixtures from a building, but leaves the service wires in the cellar thereof, and fails to cut off the current flowing through the wires as might have been done by means of a switch in the street, and an occupant of the building comes in contact with one of such wires and is killed, the question is one for the jury whether, under the circumstances, the fault of the company to cut off the current constituted negligence.

5. When a given state of facts is such that reasonable men may fairly differ upon the question of whether there was negligence or not, the determination of the matter is for the jury; it is only where the facts are such that all reasonable men must draw the same conclusion from them that the question is ever considered as one of law for the court.

6. Where one of the employees of a saloon went into the cellar of the building, and was killed by coming in contact with an electric wire, and another employee, about two and a half hours afterwards, under the direction of the managing agent of his employer, and in company with his superior, went into the cellar, and on the way out, in some manner unknown, came in contact with the wire and was killed, it cannot be said, in an action against the electric lighting company owning the wire that the decedent was guilty of contributory negligence in law, but the question is one for the jury.

7. In an action under the act of Congress of February 17, 1885, to recover for the negligent killing of plaintiff's intestate, a minor, where it appears that the sole next of kin of the intestate is an aged father, to whose support the intestate occasionally contributed, and who was partially incapacitated to earn a livelihood, an instruction to the jury to the effect that the plaintiff is entitled to recover such sum as will reasonably compensate the father for any financial loss sustained by reason of his son's death, such loss to be measured by such sum as the evidence may show the father would have probably received from the decedent had he continued to live, is not erroneous, the recovery not being limited to such sum as the father might reasonably have expected to receive from his son during the residue of his minority had he continued to live (following *District of Columbia* v. *Wilcox*, 4 App. D. C. 90).

8. In such a case, evidence is admissible tending to show the age, feeble health, burdens, and poverty of the father of the deceased, as affording some aid to the jury in determining the reasonable probability of the continuance of the contributions of the deceased during the life of the father.

No. 1268.   Submitted April 24, 1903.   Decided June 2, 1903.

HEARING on an appeal by the defendant from a judgment of the Supreme Court of the District of Columbia on the verdict of a jury in an action to recover damages for the negligent killing of the plaintiff's intestate.                    *Affirmed.*

The COURT in the opinion stated the case as follows:

This is an appeal from a judgment in the sum of $1,500 recovered against the United States Electric Lighting Company by Nellie Sullivan, as administratrix of the estate of Michael Hurley, deceased, in an action, under the statute, for damages sustained through the negligent killing of said Hurley on September 19, 1900.

Michael Hurley was a strong and healthy young man, about six feet tall, and weighed about one hundred and ninety pounds.

He was about nineteen years old, unmarried, and had come from Ireland to the District of Columbia about six months before his death. He left a father, aged about sixty years, who lived in Ireland, and was engaged in the meat and fish business. Intestate had assisted him therein before leaving Ireland. Over the objection of the defendant, plaintiff was permitted to prove that the father was "very weak in health, laid up with rheumatism and internal diseases, and was not able to do any laboring work;" also that he had eight children—four boys and four girls —the ages of whom do not appear.

Intestate had been employed generally as a bartender, and two days before his death went into the service of one John J. O'Keefe, who kept a liquor store and bar at 1116 Seventh street, N. W., in the city of Washington. O'Keefe contracted to furnish him lodging, board, and washing, and pay him $30 per month.

In front of O'Keefe's house there was a cellar door about 3 feet square from which steps descended to a cellar under said house, that was used for storing beer. In December, 1899, O'Keefe had electric light introduced into his house, the wires for which ran from the street into the cellar alongside the wall

of the cellar trap. This wire, it appears, was also extended through the cellar to two adjacent houses, occupied by other persons, for the purpose of lighting them. After using the light a month or two, O'Keefe instructed the electric light company to remove the lighting fixtures, which was done. Shortly thereafter, the lights were discontinued in the adjacent houses. The feed wires in the cellar were not removed by the defendant, nor was the current discontinued therein by means of the switch or cut-off for that purpose situated in the street or sidewalk. O'Keefe did not know, and had not been informed, that the current remained connected with the wire in the cellar. He said that he had seen the wire exposed, about one foot, during the summer of 1900. Half-barrels of beer were put in the cellar through the trap-door on the sidewalk and blocks of ice also. There was also a door in the bar-room, back of the bar, through which the cellar could be entered; but before September, 1900, that door had been secured with nails and the steps removed. O'Keefe could not say whether or not the exposure of the wires referred to had been caused by the passage of beer and ice through the sidewalk entrance. About 12 o'clock on the night of September 19, 1900, and after the death of Hurley, O'Keefe saw the wire on the wall, inside the cellar entrance, "spitting fire;" but had never seen this before. On the night of September 19, 1900, the bar room was in charge of William Broderick, assisted by Hurley and two negro men, named Thomas Hall and Thomas Rogers. Hurley had been employed two days before; the others had been there longer. Hurley's business was to wait on customers, bottle whiskey, and make himself generally useful. Between 8 and 9 o'clock that night, Thomas Hall was sent into the cellar to tap a keg of beer. He went alone, and by some means or other came in contact with the electric current in the wires aforesaid, and was instantly killed. Broderick testified that until that time he had been unaware that the wire was "alive." The inside cellar door was broken open and the body of Hall removed through that entrance.

Broderick testified also that about two hours after Hall's death it became necessary to tap another keg of beer, and that

it was not his business, but that of the negro assistant to do it; that he asked Rogers to go into the cellar for the purpose, who declined, saying he was afraid of meeting Tom Hall, but did not say he was afraid of the wire; that witness and Hurley then went into the cellar to tap the beer; after doing this, Hurley preceded witness in going out, and while going up the cellar trap came in contact with the wire and was killed; that witness had requested Hurley to go down into the cellar to tap the beer, but he had refused, stating that he would not go alone, but would go down with witness; that he was afraid of the wire. On cross-examination he said "that Hurley did not give any reason for not going down into the cellar alone, because witness did not ask him to go unaccompanied; that witness does not remember testifying in his direct examination that Hurley said he would not go down alone because he was afraid of the wire; that Hurley had only been in the cellar once; that witness had never noticed the wires before Hall's death, and did not know whether they were in a wooden casing, or whether the casing had been knocked off by the beer kegs and blocks of ice that had been constantly rolled into the cellar."

Thomas Rogers testified that he tapped beer and did nothing else; that he had never noticed the wires; that he went into the cellar with Hall when the latter was killed; that Hall's body was taken up through the trap behind the bar, and witness came out the same way also; that after Hall's death Broderick asked witness to go down and tap beer, and witness refused; that Broderick then said he would go down and tap the beer himself, and Hurley followed him down two minutes afterwards; that at the time Hurley was killed witness saw sparks come from the wire; that he received a shock from Hall's body while Hall's hand was in contact with the wire. On cross-examination, he said that he had paid no particular attention to the wire while in O'Keefe's employ for some time before; that after Hall's death he saw where the wires had been encased in wood, but had never seen the casing knocked off in putting in beer and ice; that he did not know the wires were dangerous before Hall was killed.

Plaintiff also introduced evidence tending to show that intes-

tate had, during the six months of his residence in Washington, sent money to his father four or five times, in sums of $10 or $15 each time.

Defendant introduced evidence tending to show that the wire introduced into the cellar by the defendant was of the customary kind, and covered by a wooden moulding that, if undisturbed, would have lasted several years; that after the accident, it was discovered that the casing had been removed for about one foot, and the wires were exposed, hanging loosely upon the wall; that the wires had been safely put in, and were cut out after Hurley's death.

Another witness testified that as inspector for the board of underwriters he had examined the wires in O'Keefe's cellar in December, 1899, and found them in compliance with the rules of the board; that on the morning after the accident he found the casing broken away for about a foot, and the lead and copper exposed for half an inch or an inch in going down the cellar entrance.

A statement of Wm. Broderick, made at the inquest upon Hall's death, was read in contradiction of him, in which he was reported as saying that kegs of beer had cut the casing more than three weeks before the accident; that the insulation had been worn off the wires for a distance of three inches also; that witness was in the cellar when Hurley came down, having come down to see how the beer was tapped; that no one ordered Hurley to go down; that he went of his own accord; that witness did not tell him to go, but to stay behind the bar.

Defendant then introduced as a witness one Loney Paris, who testified that he was in the saloon when Hurley was killed and had been helping there occasionally; that he helped Broderick, Hurley, and a man from the morgue to take Hall's body from the cellar; that witness was the only person who saw Hurley killed; that the beer gave out in the bar and Broderick asked Rogers to go down and tap a keg, but he declined; that Broderick then asked Hurley to go, and the latter said he would not go for $1,000; that Broderick said he would go himself, and told Hurley if he would come he would show him the wire spit fire; that

Hurley and Broderick went out and a customer came in, when Broderick told Hurley to go back, which he did; that Broderick then went into the cellar; that witness was standing outside looking at the wire, when Hurley came out, and told witness he was going down; witness told him it was dangerous, whereupon Hurley said: "Oh, hell! there is no danger;" that Hurley asked where the wire was and witness said: "There it is, spitting fire, right in front of you;" that Hurley passed safely into the cellar, went to the ice-box, and was told by Broderick to go upstairs; that while in the act of picking his apron up to go upstairs his arm touched the wire and he was killed. Witness further said that after Hall's death Hurley took a glass of whiskey every five or seven minutes, and was staggering a bit as he went into the cellar, but he would not call him drunk; that he saw the wires when put in the cellar, and the casing put over them; that at one time he saw the casing partly knocked off, and had nailed a board over the wire about a month before.

Defendant introduced other evidence tending to show that Hurley had been in the habit of drinking to excess. This was rebutted by the plaintiff, who further introduced evidence, contradicting the witness Paris in some material particulars, as well as tending to show him to be an untrustworthy person.

The court refused prayers of the defendant to the effect that the jury must find for the defendant, because the evidence did not show any negligence on the part of the defendant in the installation and maintenance of the wire, and also because the intestate's death was caused by his own want of care.

Upon the refusal of those prayers, the defendant asked several others, which were given, carefully instructing the jury in respect of the law of negligence of each party in relation to the evidence.

At the request of the plaintiff the court instructed the jury that in event of finding for the plaintiff the recovery should be "such sum, by way of damages, as will fairly and reasonably compensate the father of the decedent for any financial loss they may find him to have sustained by reason of the decedent's death, such loss to be measured by such sum as the evidence may show

the said father would probably have received from the decedent had he continued to live."

The following prayer, asked by the defendant, was refused: "If the jury should find for the plaintiff, the measure of damages would be only for such sum of money as they may find from the evidence that the father of the decedent might reasonably have expected to receive from him during the residue of his minority."

Exceptions were duly reserved by the defendant to the refusal of each of its prayers, and to that given for the plaintiff.

After verdict, the defendant moved for a new trial, and in arrest of judgment. Both motions were overruled.

*Mr. C. C. Cole, Mr. R. B. Behrend, Mr. R. S. Huidekoper,* and *Mr. B. W. Parker,* for the appellant:

1. There was no evidence tending to show that the defendant had any notice or knowledge whatever of the fact that the casing and insulation had been knocked off by the beer kegs and ice blocks.   The wires were put there not only for the use of O'Keefe's premises, but other premises beyond his, and he knew and assented to this.   While it is true that all the parties had ceased for some time prior to the accident to use the electric light, there is nothing tending to show that this was not temporary, and that the defendant might well expect to have the parties or some of them renew their use of the electric light.   There is no evidence that they had been notified by O'Keefe or anyone else to remove the wires.   It is therefore submitted that there was no sufficient evidence of negligence on the part of the defendant, and that the verdict should have been directed upon this ground.

2. But if it should be considered that the evidence was of that character that it was a fair question for the jury as to whether the defendant was guilty of negligence, or not, under the circumstances, in not removing the wires, there can be no difference of opinion that the deceased was guilty of contributory negligence, as matter of law, and that a verdict for the defendant should have been directed upon that ground.

Hall had been killed but two hours, or thereabouts, before, by

this electric wire. Deceased helped remove his body. He knew the locality of the wire. He knew that there was a perfectly safe way to go from the saloon into the cellar and the ice-box, by means of the trap door in the rear of the bar, without going near the wire. If there had been any necessity for his going into the cellar, or if he desired to go, there was a perfectly safe way for him to go and return without going near enough to the wire to be able to touch it. The fact that it was, perhaps, more inconvenient to get into the cellar that way than the other is not entitled to consideration. Besides, it appears that Broderick went down the hatchway without coming in contact with the wire, as did deceased, showing that it was entirely feasible for a man to do that if he was ordinarily careful in doing so. There is no reason why deceased could not have returned by the same route he went into the cellar on that occasion, in safety, by taking the same care that he did when he went in. The accident and his death may be accounted for only upon the theory that he was so much excited with liquor as to make him entirely fearless of consequences. The following cases are referred to as illustrating the circumstances under which courts have held that plaintiffs were guilty of contributory negligence as matter of law, and it is respectfully submitted that the present case is as clearly a case of contributory negligence as matter of law as any of them, and much stronger that many. *R. R. Co.* v. *Jones,* 95 U. S. 439; *Mo. Pac. R. R.* v. *Moseley,* 57 Fed. 921; *R. R. Co.* v. *Houston,* 95 U. S. 607; *Schofield* v. *R. R. Co.* 114 U. S. 615; *Aergfetz* v. *Humphries,* 145 U. S. 418, 420; same held in *Pyle* v. *Clark,* 79 Fed. 744; *District of Columbia* v. *Moulton,* 182 U. S. 576, 579; *Elliott* v. *C. M. & St. P. R. R.* 150 U. S. 245; *Allyn* v. *B. & A. R. R.* 105 Mass. 77; *Gravitt* v. *M. & L. R. R.* 16 Gray, 501; *Claus* v. *Northern Steamship Co.* 89 Fed. 646; *Donaldson* v. *Mil. St. & Rwy. Co.* 21 Minn. 293; *Ramsdell* v. *Jordon,* 3 Am. Neg. R. 47 [Mass. 1897]; *Taylor* v. *Manuf. Co.* 143 Mass. 470; *Ballon* v. *Callamore,* 160 Mass. 246; *Breinstein* v. *Mattson,* 10 Daly, 336; *Warden* v. *L. & U. R. R.* 95 Ala. 277; *Delaney* v. *Milw., K. & St. Paul Railway Co.* 33 Wis. 72; *Columbus and Western Rail-*

*road Co.* v. *Bradford,* 86 Ala. 574–583; *L. & N. R. R.* v. *Yuiestra,* 21 Fla. 700-730; *Kansas & T. Coal Co.* v. *Reid,* 85 Fed. 914; *Haring* v. *New York & E. R. R.* 13 Barb. 9–14; *Claus* v. *Northern Steamship Co.* 89 Fed. 646; *Nave* v. *Flach,* 90 Ind. 205; *Hemmingway* v. *W. U. Tel. Co.* 41 Fed. 864; *Sickles* v. *N. J. Ice Co.* 153 N. Y. 83; *Dietrich* v. *B. & H. S. R. R. Co.* 58 Md. 347; *Wood* v. *Diamond, etc., Co.* 185 Pa. St. 529; *District of Columbia* v. *Brewer,* 7 D. C. App. 113; *Hurdle* v. *R. R. Co.* 8 D. C. App. 120; *Elliott* v. *Chicago, Mil. etc. Ry.* 150 U. S. 245; *Richmond & Danville Railroad* v. *Didzoneit,* 1 App. D. C. 482; *Stearman* v. *B. & O. R. R.* 6 App. D. C. 46; *Wash. & Geo. R. R.* v. *Wright,* 7 App. D. C. 295.

3. The court should have instructed the jury, as prayed by the defendant, that if the wire was properly and safely insulated and protected, and the defendant had no notice or knowledge of its dangerous condition prior to the accident, they should have found for the defendant. This is believed to be an entirely sound proposition of law, and should have been affirmed by the court.

4. The court should also have instructed the jury, as prayed by the defendant, that if the dangerous condition of the wire was occasioned by the throwing of the beer kegs and ice into the cellar, and that that was the proximate cause of the accident, they should find for the defendant. That was a proper instruction to be given. If the facts supposed by it were found by the jury to be true, the proximate cause of the accident was not the act of the defendant, but the act of another party, and that party the occupier of the premises. *Mo. Pac. R. Co.* v. *Columbia,* 58 L. R. A. 399.

5. It is submitted that the evidence in the case conclusively proved that the deceased was a volunteer in going into the cellar, which, if true, would preclude his recovery; but if we are mistaken in that, there was certainly evidence from which the jury might have found that he was a volunteer, and the defendant was entitled to have the jury instructed upon that theory of the case. If he went into the cellar as a volunteer, when there was no occasion for him to go, under the circumstances of this case he would not be entitled to recover, and the defendant was entitled to have the jury so told.

6. It was contended on behalf of the defendant that the measure of damages was the sum the father might reasonably have expected to receive from his son during the residue of his minority. While there is some conflict in the cases upon this point, the great weight of the decided cases, as well as the reason of the rule, is in favor of the contention of the defendant. The latest case upon the subject is *Schnevel* v. *Providence Public Market,* decided October 20, 1902, by the supreme court of Rhode Island, 53 At. Rep. 634. The opinion in that case reviews most of the former cases in this country upon the subject. Among the most important of them are: *State* v. *B. & O. R. R. Co.* 24 Md. 105; *C. & P. R. Co.* v. *State,* 44 Md. 283; *A. & M. Asso.* v. *State,* 71 Md. 86; *Iron Company* v. *Rupp,* 100 Pa. St. 95; *Terhune* v. *Contracting Company,* 76 N. Y. Supp. 255; *Cooper* v. *Railway Company,* 66 Mich. 261; *Hurst* v. *Railway Company,* 84 Mich. 44.

7. The ruling of the court, by which the jury were informed of the health of the father, and the condition of his family and business, was clearly error. It had a tendency to increase the damages, while the facts proven were not elements of damage at all, the measure of damages being what pecuniary advantage the father might reasonably have expected to derive from the continued life of his son during his minority. *Pennsylvania Railroad Company* v. *Roy,* 102 U. S. 451; *B. & O. R. R. Co.* v. *Camp,* 81 Fed. 807; *Ry. Co.* v. *Powers,* 74 Ill. 343; *City of Chicago* v. *O'Brennan,* 65 Ill. 160; *Dayharsh* v. *Hannibal & St. J. R. Co.* 15 S. W. 554; *Dreiss* v. *Friedrich,* 57 Tex. 70.

8. The court below erred in ruling that the plaintiff, although administratrix of the estate of the deceased, was a competent witness to testify in her own behalf.

9. The court erred in refusing to permit the defendant to prove the custom of inspection of electric lighting wires situated as these were. It was contended that the defendant owed a duty of inspection, and it was proper that the jury should have been informed what the usages and customs were in that regard, in relation to wires similarly situated.

*Mr. George E. Hamilton* and *Mr. Michael J. Colbert,* for the appellee:

1. The court below was asked by the appellant to tell the jury that if the electric wire was properly and safely insulated and protected, and if the company did not know of its dangerous condition before the accident, they should find for the defendant. The company did know of its dangerous condition. The company created the condition. The company was notified to remove its property from the premises in question, and while so engaged deliberately allowed a loose wire charged with a deadly current to hang in this hatchway or cellar, which was in daily use by the occupants of the building. And yet the court is asked to say that if the company had once installed the wires and had properly insulated them, they were not responsible for this accident, regardless of their subsequent conduct in allowing the wires to remain in an exposed position, charged with a dangerous current of electricity. The statement of this proposition is sufficient to show its unsoundness.

2. The decedent was not guilty of such contributory negligence as required the case, as matter of law, to be withdrawn from the jury. The law upon this subject is too well settled to require much citation of authority. "Knowledge of danger is not in itself negligence. It is usually held to be a question for the jury whether the plaintiff was in the exercise of due care to avoid the known danger." 7 Enc. of Law., 2d ed., pp. 392, 393. A verdict for the defendant at the close of the plaintiff's testimony should only be directed when but one reasonable view can be taken of the evidence and of its every intendment, and that view is utterly opposed to the plaintiff's right to recover. *Balto. & Potomac Ry. Co.* v. *Carrington,* 3 App. D. C. 101; *R. R. Co.* v. *Powers,* 149 U. S. 43; *Gardner* v. *R. R. Co.* 150 U. S. 349; *R. R. Co.* v. *Mangans,* 61 Md. 53. The question of contributory negligence is, as a general rule, for the jury. *R. R. Co.* v. *McDade,* 135 U. S. 554; *R. R. Co.* v. *Harmon,* 147 U. S. 571. The cases are but few in which the court can say, as matter of law, that contributory negligence exists. *R. R. Co.* v. *Grant,* 11 App.

D. C. 107.   A person is not guilty of contributory negligence *per se* in walking upon a sidewalk on which there are loose boards, knowing of their presence there, but not knowing their exact location.   *District of Columbia* v. *Crumbaugh,* 13 App. D. C. 553; see Sherman & Redfield on Neg. § 376; *Kavanaugh* v. *Janesville,* 24 Wis. 619; *Bullock* v. *N. Y.* 99 N. Y. 654; *Wheeler* v. *Westport,* 30 Wis. 392; *Smith* v. *St. Joseph,* 45 Mo. 449; *Rice* v. *Des Moines,* 40 Iowa, 638; *Griffin* v. *Auburn,* 58 N. H. 121; *Erd* v. *St. Paul,* 22 Minn. 443; *Aurora* v. *Dale,* 90 Ill. 46; *Dooley* v. *Meriden,* 44 Conn. 118; *Turnpike Co.* v. *Jackson,* 86 Ind. 111; *Coates* v. *Canaan.* 51 Vt. 131; *Montgomery* v. *Wight,* 72 Ala. 411; *Pomphrey* v. *Saratoga,* 104 N. Y. 459; *Noble* v. *Richmond,* 31 Gratt, 271; *Baltimore* v. *Holmes,* 39 Md. 243. Knowledge on part of plaintiff as to defective condition of highway will not bar recovery.   *Courts* v. *District of Columbia,* 18 District of Columbia, 277; *Muller* v. *District of Columbia,* 5 Mackey, 286; *Prince Geo. Co.* v. *Burgess,* 61 Md. 31; *Mosheuvel* v. *District of Columbia,* 191 U. S. 247.   In an action to recover for injuries received through a defect in the highway, the fact that, knowing of the defective place, he voluntarily attempted to pass it, is not conclusive of a want of due care on the part of the plaintiff, but only a circumstance for the jury in determining that question.   *Lyman* v. *Amherst,* 107 Mass. 339; *Frost* v. *Waltham,* 12 Allen, 85.   So where a tenant while using a stairway left in an unsafe condition by the landlord was injured, it was said the fact, if proved, that the plaintiff had previous knowledge that the stairs were in a dangerous condition would not be conclusive evidence that the plaintiff was not in the exercise of due care.   *Looney* v. *McLean,* 129 Mass. 33.

3. Could the jury consider the probability of financial benefit to the father beyond the period of the decedent's majority?   In this connection it must be remembered that it is not necessary that the party for whose use the suit is brought should have a legal claim on the deceased for support.   *Barron's Case,* 5 Wall. 90; *Wilcox* v. *District of Columbia,* 4 App. D. C. 90; See also *Chicago* v. *Major,* 18 Ill. 349; Am. & Eng. Enc. Law, 2d ed. vol. 8, p. 920; *Maryland* v. *R. R. Co.* 1 Hughes (U. S.) 337; *Hall* v. *Gal-*

*veston, etc. R. Co.* 39 Fed. Rep. 18; *Balt. etc. R. Co.* v. *Then,* 159 Ill. 535; *Potter* v. *N. W. R. Co.* 21 Wis. 375; *Ewen* v. *C. & N. W. R. Co.* 38 Wis. 622; *Regan* v. *C. M. & St. P. R. Co.* 51 Wis. 600; *Chicago* v. *Powers,* 42 Ill. 170; *Burley* v. *Chicago & A. R. Co.* 4 Biss. 430; *Johnson* v. *Chicago & N. W. R. Co.* 64 Wis. 425; *Illinois Cent. R. Co.* v. *Slater,* 129 Ill. 91; *Railway Co.* v. *Davis,* 55 Ark. 462; *Maryland* v. *B. & P. R. Co.* 1 Hughes, 337; *Pierce* v. *Connors,* 20 Col. 178. · The court did not err in refusing to instruct the jury that in an action by a parent for the death of his minor child the measure of damages is "the value of the child's services until he becomes of age, less the expenses of his support during that time." *Holt* v. *S. & P. R. Co.* (Idaho, 1893) 35 Pac. Rep. 39. In an action by an administrator for damages on account of the death of an infant, substantial damages may be recovered by the plaintiff, notwithstanding such recovery must be based upon the probable accumulation of an estate after the infant has reached the age of twenty-one years. *Walters* v. *C. R. I. & P. Ry. Co.* 41 Iowa, 71. In an action brought by parents against a railroad company to recover damages for negligently causing the death of their minor son, the jury are not necessarily restricted to an allowance of the value of the son's services during minority, but may take into consideration pecuniary benefits which the parents may reasonably be expected to receive from him after reaching his majority. *Atchison, T. & S. F. R. Co.* v. *Cross,* 49 Pac. R. 599. See also *Birkett* v. *Knick. Ice Co.* 110 N. Y. 508; *Coghlan* v. *3d Ave. R. Co.* 39 N. Y. Supp. 113; *Pa. R. Co.* v. *Bantom,* 54 Pa. St. 495; *The Gulf, Colorado & Santa Fe R. Co.* v. *Compton,* 75 Texas, 667; *S. A. St. R. Co.* v. *Mechler,* 29 S. W. Rep. 202; *G. H. & S. Antonio R. Co.* v. *Davis,* 4 Tex. C. App. 468; *Potter* v. *C. & N. W. R. Co.* 21 Wis. 380.

Mr. Justice SHEPARD delivered the opinion of the Court:

1. This action was begun under the act of Congress approved February 17, 1885 (23 Stat. at L. 307) chap. 126, D. C., Code §§ 1301, 1302, 1303; § 1 of which (Code § 1301) provides:

"that, whenever by an injury done or happening within the limits of the District of Columbia, the death of a person shall be caused by the wrongful act, neglect, or default of any person or corporation, and the act, neglect, or default is such as would, if death had not ensued, have entitled the party injured, or, if the person injured be a married woman, have entitled her husband, either separately or by joining with the wife, to maintain an action and recover damages, the person who or corporation which would have been liable if death had not ensued shall be liable to an action for damages for such death, notwithstanding the death of the person injured, even though the death shall have been caused under circumstances which constitute a felony; and such damages shall be assessed with reference to the injury resulting from such act, neglect, or default, causing such death, to the widow and next of kin of such deceased person: *Provided,* that in no case shall the recovery under this act exceed the sum of ten thousand dollars: *And Provided further,* that no action shall be maintained under this act in any case when the party injured by such wrongful act, neglect, or default has recovered damages therefor during the life of such party."

Sec. 2 (Code § 1302): "That every such action shall be brought by and in the name of the personal representative of such deceased person, and within one year after the death of the party injured."

Sec. 3 (Code § 1303): "That the damages recovered in such action shall not be appropriated to the payment of the debts or liabilities of such deceased person, but shall inure to the benefit of his or her family, and be distributed according to the provisions of the statute of distributions in force in the said District of Columbia."

The declaration of the administratrix alleges in each of its two counts that "the intestate left surviving him as his next of kin, his father, John Hurley, who has suffered great damage by reason of his death," etc.

As shown in the preliminary statement, the evidence of damage to the father as next of kin was confined to the occasional contributions of the intestate to his support, the partial incapac-

ity of the father to earn a livelihood, and the probability of the continuation of this assistance had the son continued to live.

The grounds of the motion in arrest of judgment are not disclosed by the record, but the proposition now is that, under the allegations of the declaration, no right of action accrued to the administratrix of the intestate's estate by virtue of the statute aforesaid.   In support of the proposition, the contention is that the earnings of the son, present and prospective, if any, belonged to the father, and that he alone has a right of action therefor against the wrongdoer.   In our opinion it is quite clear that the father has no right of action in this case independently of the statute.

At common law, the right of a parent to recover for loss of the services of his minor child, like that of the husband for the services of the wife, is limited to the time that may have elapsed, if any, between the time of the injury giving rise to the action, and the resulting death.   The right to the services, in either case,. terminates with death, and the estimate of damages ceases therewith.   *Baker* v. *Bolton,* 1 Campb. 493; *Osborn* v. *Gillett,* L. R. 8 Exch. 88, 92; *Carey* v. *Berkshire R. Co.* 1 Cush. 475, 48 Am. Dec. 616; *Eden* v. *Lexington & F. R. Co.* 14 B. Mon. 204, 206; *Louisville & N. R. Co.* v. *McElwain,* 98 Ky. 700, 702, 34 L. R. A. 788, 34 S. W. 236; *Quin* v. *Moore,* 15 N. Y. 432, 433; *Hyatt* v. *Adams,* 16 Mich. 180, 184; *Scheffler* v. *Minneapolis & St. L. R. Co.* 32 Minn. 125, 19 N. W. 656; *Stewart* v. *Louisville & N. R. Co.* 83 Ala. 493, 4 So. 373; *Davis* v. *St. Louis, I. M. & S. R. Co.* 53 Ark. 117, 127, 7 L. R. A. 283, 13 S. W. 801.

It is manifest also that no action could be maintained in the name of intestate's father under the statute, because it is expressly declared that "every such action shall be brought by and in the name of the personal representative of such deceased person."   *Western U. Teleg. Co.* v. *Lipscomb, ante,* p. 104.

. It follows, therefore, that if the action in this case cannot be maintained by the personal representative of the intestate for the ultimate benefit of the father, who is the next of kin, and alone has been shown to have sustained any injury by the death of the son, the judgment ought to be arrested, for the remedy of the statute goes no farther.

The act of the British Parliament, known as Lord Campbell's act, recites in its preamble the failure of the common law to furnish an action for injuries resulting in death, and proceeds to provide a remedy by giving an action, to be brought in the name of the personal representative of the person whose death shall have been caused by wrongful act, neglect, or default, for the benefit of the wife, husband, parent, and child of such person. This act, said Lord Chancellor Selborne, "gives a new cause of action clearly, and does not merely remove the operation of the maxim, *actio personalis moritur cum persona,* because the action is given in substance not to the person representing, in point of estate, the deceased man, who would naturally represent him as to all his own rights of action which could survive, but to his wife and children, no doubt suing in point of form in the name of his executor." · *Seward* v. *Vera Cruz,* L. R. 10 App. Cas. 59, 67.

Lord Campbell's act has been adopted in every State of the Union, with more or less change in respect of the persons to be benefited, the designation of the parties in whose name the action shall be brought, and the measure of damages to be recovered. Under these various statutes multitudes of actions have been maintained on behalf of surviving parents, for damages sustained through the death of children, whether infants or adults, to whose services they had a right, legal or otherwise, to look for support or assistance; and in no case that we have been able to discover has recovery been denied on the ground under consideration.

The action does not depend at all upon the fact whether the next of kin—parent, or brothers and sisters, as the case may be —shall have a legal claim upon the services of which they have been deprived by the wrongful act of the defendant. *Illinois C. R. Co.* v. *Barron,* 5 Wall. 90, 106, 18 L. ed. 591, 595; *District of Columbia* v. *Wilcox,* 4 App. D. C. 90, 119. And although it might be possible, under the terms of our statute, which requires recovery *in solido,* that a judgment founded chiefly on proof of special damage to one of the next of kin would have to be shared finally with others less meritorious, that fact is one that in no

wise concerns the wrongdoer.   *District of Columbia* v. *Wilcox,*
4 App. D. C. 90, 122.

We are of the opinion, therefore, that the motion in arrest of
judgment was properly overruled.

2. There was no error in refusing the prayer to direct a ver-
dict for the defendant on the ground that the evidence was not
sufficient to warrant the submission of the question of its negli-
gence to the jury.

We see no occasion to discuss the evidence relating to the man-
ner in which the service wires for the lighting current had been
protected when carried into the building, or to the probable man-
ner in which that protection may have been destroyed by the acts
of the owner of the building or his employees.

Nor is it of any consequence to consider whether there was
any ground for the inference of negligence from the failure of
the defendant to remove the service wires after the lights main-
tained thereby had been discontinued.

Had the defendant stopped the flow of the deadly current into
the premises through those useless service wires, by means of the
switch provided for that purpose in the street, no injury could
possibly have occurred from the destruction of the insulation.
The failure to exercise this simple precaution led to the death
of two persons, and might at any time have caused a destructive
conflagration. It was plainly a question for the jury to deter-
mine whether, under all the circumstances, the failure of the
defendant to cut off the current constituted negligence.

3. The next assignment of error is based on the refusal of
the court to direct a verdict for the defendant on the ground that
it appeared conclusively, from all the evidence submitted, that
the death of plaintiff's intestate was the direct result of his own
negligence.

Several special prayers directing the attention of the jury to
certain leading facts from which, it was declared, contributory
negligence was a necessary inference, were then asked and re-
fused; but these may be considered as embraced in the general
proposition.

The rule of determination in cases like the present has been

thus stated by the Supreme Court of the United States: "What may be deemed ordinary care in one case may, under different surroundings and circumstances, be gross negligence.   The policy of the law has relegated the determination of such questions to the jury under proper instructions from the court.   It is their province to note the special circumstances and surroundings of each particular case, and then say whether the conduct of the parties in that case was such as would be expected of reasonable, prudent men under a similar state of affairs.   When a given state of facts is such that reasonable men may fairly differ upon the question as to whether there was negligence or not, the determination of the matter is for the jury.   It is only where the facts are such that all reasonable men must draw the same conclusion from them, that the question of negligence is ever considered as one of law for the court." *Grand Trunk R. Co.* v. *Ives,* 144 U. S. 408, 417, 36 L. ed. 485, 489, 12 Sup. Ct. Rep. 683; see also *Texas & P. R. Co.* v. *Gentry,* 163 U. S. 353, 368, 41 L. ed. 186, 193, 16 Sup. Ct. Rep. 1104.

The controlling fact upon which the appellant rests its contention is, that the deceased went into the cellar with knowledge that, two and one-half hours before, another able-bodied man had met sudden death therein through coming in contact with the electric current.   It may be conceded that from this fact many reasonable minds might come to the conclusion that his death was the result of his neglect of ordinary care.   But the question is, Would all reasonable men come to that conclusion upon a full and fair consideration of all the facts in evidence?

What constitutes negligence can not be laid down as a rule for every case, but, as we have seen, necessarily depends upon the special circumstances and conditions of the particular case under investigation.   In order to reach a just conclusion in each particular case, reasonable effect must be given to every legitimate inference that may be deduced from the facts in evidence, as well as from all the circumstances surrounding the occurrence and tending to shed any light upon it.

It is reasonable and just to consider the conditions, and the force of the obligation of the service in which the deceased was engaged at the time, as influencing his conduct.

It was important to the business of the employer that the cellar should be visited, and Broderick, the manager in the absence of the common employer, did not consider the act as necessarily one of imminent danger. That he requested first one and then another of his assistants to enter the cellar, may be slight evidence of his belief, but it is some. However, when one of these refused, rather from superstition than fear of bodily harm, he gave the best evidence of his belief by going himself.

Broderick was presumably a man of average capacity, familiar with the premises, and, moreover, apparently sober. Deceased saw him descend into the cellar in safety, and followed him to the place where the work was to be done. On the way out, deceased, in some manner unknown, came in contact with the fatal current.

We have not the case, then, of one walking deliberately into apparent danger, without necessity, and when others, to his knowledge, refused because of that danger, but of a subordinate who followed in the footsteps of an older and more experienced man who was the managing agent of his employer. The concurring acts of two men of average intelligence proportionately increase the difficulty of declaring, as matter of law, that the act of one—especially one who followed where an older and more experienced man led the way—constituted contributory negligence, taking away any right of recovery founded on the preceding negligence of the defendant.

These special circumstances were sufficient, in the opinion of the trial court, to warrant the submission of the issue to the jury. In the case of doubt, always, the determination of the question falls within the province of the jury. We are not prepared to say that it was error to refuse the defendant's motion and special prayers.

4. The fourth assignment of error relates to the measure of damages given in charge to the jury. The contention of the appellant, whose special prayer to that effect was denied, is that the recovery on behalf of the father is limited to such sum as he might reasonably have expected to receive from the son during the residue of his minority, had he continued to live.

The charge given, instead, was that "the plaintiff is entitled to recover such sum as will fairly and reasonably compensate the father of the decedent for any financial loss * * * sustained by reason of the decedent's death; such loss to be measured by such sum as the evidence may show the said father would have probably received from the decedent had he continued to live."

We are of the opinion that there was no error in the charge to the jury. As has been said by Mr. Justice Nelson: "The damages in these cases whether the suit is in the name of the injured party, or, in the case of his death, under the statute by the legal representative, must depend very much on the good sense and sound judgment of the jury upon all the facts and circumstances of the particular case. If the suit is brought by the party, there can be no fixed measure of compensation for the pain and anguish of body or mind, nor for the loss of time and care in business, or the permanent injury to health and body. So, when the suit is brought by the representative, the pecuniary injury resulting from the death to the next of kin is equally uncertain and indefinite. If the deceased had lived, they may not have been benefited, and if not, then no pecuniary injury could have resulted to them from his death. But the statute in respect to this measure of damages seems to have been enacted upon the idea that, as a general fact, the personal assets of the deceased would take the direction given them by the law, and hence the amount recovered is to be distributed to the wife and next of kin in the proportion provided for in the distribution of personal property left by a person dying intestate. If the person injured had survived and recovered, he would have added so much to his personal estate, which the law, on his death, if intestate, would have passed to his wife and next of kin; in case of his death by the injury, the equivalent is given by a suit in the name of his representative. There is difficulty in either case in getting at the pecuniary loss with precision or accuracy, more difficulty in the latter than in the former, but differing only in degree, and in both cases the result must be left to turn mainly upon the sound sense and deliberate judgment of the jury." *Illinois C. R. Co. v. Barron,* 5 Wall. 90, 105, 18 L. ed. 591, 595.

That case arose under a statute of the state of Illinois, which, though differing slightly in phraseology, is substantially similar in all its important provisions to the act of Congress which was enacted after its decision.

Under the New York statute, which also limits the damages to be assessed for the benefit of the widow and next of kin to "a fair and just compensation for the pecuniary injuries resulting from the decedent's death," it was said by the court of appeals of that state: "In but few cases arising under this act is the plaintiff able to show direct, specific, pecuniary loss, suffered by the next of kin from the death; and, generally, the basis for the allowance of damages has to be found in proof of the character, qualities,. capacity, and condition of the deceased and in the age, sex, circumstances, and conditions of the next of kin. The proof may be unsatisfactory, and the damages may be quite uncertain and contingent, yet the jurors in each case must take the elements thus furnished and make the best estimate of damages they can." *Lockwood* v. *New York, L. E. & W. R. Co.* 98 N. Y. 523, 526. See also, *Birkett* v. *Knickerbocker Ice Co.* 110 N. Y. 504, 508, 18 N. E. 108.

In numerous other cases that might be cited, the same liberal rule for the ascertainment of damages to next of kin has been followed as necessary to give any practical effect to the remedial purpose of such legislation. In many of these, where the deceased was an infant (sometimes of tender years), the recovery has not only been permitted to include probable pecuniary injury, founded on a legal claim to the deceased infant's services during minority, but also that which might be fairly estimated with reference to the reasonable expectation of the continuance, to some extent, of those services after majority, founded on conditions of age, feeble health, and poverty reasonably sufficient to create a strong moral obligation on the part of the child. *Baltimore & O. S. W. R. Co.* v. *Then,* 159 Ill. 535, 539, 42 N. E. 971; *Illinois C. R. Co.* v. *Slater,* 129 Ill. 91, 100, 6 L. R. A. 418, 21 N. E. 575; *Johnson* v. *Chicago & N. W. R. Co.* 64 Wis. 425, 431, 25 N. W. 223; *Thompson* v. *Johnston Bros. Co.* 86 Wis. 576, 586, 57 N. W. 298; *Thoresen* v. *La Crosse City R. Co.* 94

Wis. 129, 133, 68 N. W. 548; *St. Louis, I. M. & S. R. Co.* v. *Davis,* 55 Ark. 462, 467, 18 S. W. 628; *Birkett* v. *Knickerbocker Ice Co.* 110 N. Y. 504, 508, 18 N. E. 108; *Atchison, T. & S. F. R. Co.* v. *Cross,* 58 Kan. 424, 428, 49 Pac. 599; *Gulf, C. & S. F. R. Co.* v. *Compton,* 75 Tex. 667, 674, 13 S. W. 667.

The plaintiff in this case offered no prayer for damages founded on any legal claim which the parent might have to the services of the deceased son during the residue of his minority; on the contrary, by proof under the general allegation of damage, the entire claim was based on the reasonable expectation that the deceased, who at intervals had made voluntary contributions to the parent, would, if his life had not been taken, continue his contributions to the parent's support during the probable duration of the latter's life.

The deceased, though lacking nearly two years of the attainment of majority, had been practically emancipated by the father; for it appears that the latter had consented to his leaving home, had attempted to make no contract for his services in the new home, had permitted him to make his own contracts for labor, and instead of demanding the proceeds of the same, had contented himself with accepting such sums as the son had voluntarily contributed therefrom to his assistance.

This state of facts put the claim for recovery upon substantially the same basis as if the deceased had been an adult; hence, the prayer asked by the defendant had no application.

Considering the case as if the deceased had been an adult, a ground of recovery is furnished that has been generally upheld under statutes of the same general purport. In addition to authorities before cited, see *District of Columbia* v. *Wilcox,* 4 App. D. C. 90; Tiffany, Death by Wrongful Act, § 168.

Tested by the rule heretofore stated, the charge of the court, to which exception was taken, must be approved as correct, and applicable to the evidence, which showed some pecuniary damage, the amount of which, uncertain as its ascertainment might be, was for the determination of the jury, subject to the supervising power of the trial justice in case of an excessive verdict.

5. The rule for the ascertainment of damages that has been

approved clearly indicates the competency of the evidence tend-
ing to show the age, feeble health, burdens, and poverty of the
father of deceased, the admission of which was also made the
ground of exception.   This was rightly admitted as affording
some aid to the jury in determining the reasonable probability of
the continuance of the contributions of the deceased during the
life of the father.   *Thompson* v. *Johnston Bros. Co.* 86 Wis.
576, 586, 57 N. W. 298; *Thoresen* v. *La Crosse City R. Co.* 94
Wis. 129, 133, 68 N. W. 548; *Missouri P. R. Co.* v. *Peregoy,* 36
Kan. 424, 431, 14 Pac. 7; *Little Rock, M. R. & T. R. Co.* v.
*Leverett,* 48 Ark. 333, 344, 3 S. W. 50; *Illinois C. R. Co.* v.
*Crudup,* 63 Miss. 291, 303; *Houston City Street R. Co.* v. *Sciac-
ca,* 80 Tex. 350, 355, 16 S. W. 31; *Birkett* v. *Knickerbocker Ice
Co.* 110 N. Y. 504, 508, 18 N. E. 108; *Baltimore & P. R. Co.* v.
*Mackey,* 157 U. S. 72, 92, 39 L. ed. 624, 631, 15 Sup. Ct. Rep.
491.  Such evidence, clearly inadmissible in ordinary actions for
damages, where it is calculated to arouse the sympathies of the
jury without furnishing any legal element of damage, stands
upon essentially different grounds when offered in a case like the
present, brought under the statute.   The distinction between
the two classes of cases is clearly pointed out in the case last
cited, which arose in the District of Columbia.

The judgment must be affirmed with costs; and it is so or-
dered.                                          *Affirmed.*